**GOVERNMENT OF THE VIRGIN ISLANDS**

v.

**GERARD E. BERNE, Appellant**

No. 17,553

United States Court of Appeals
Third Circuit

Argued January 31, 1969
Decided May 12, 1969

*See, also, 412 F.2d 1055*

JOHN E. STOUT, ESQ. (GRUNERT & STOUT), St. Thomas, Virgin Islands; THOMAS D. IRELAND, ESQ. (MAAS, IRELAND & BRUNO), St. Thomas, Virgin Islands, *for appellant*

VINCENT A. COLIANNI, ESQ., Assistant United States Attorney, St. Thomas, Virgin Islands, *for appellee*

Before MARIS, FREEDMAN and ALDISERT, *Circuit Judges*

## OPINION OF THE COURT

ALDISERT, *Circuit Judge*

The appellant was convicted by a jury of Rape in the First Degree and sentenced to one year's imprisonment.[1]

---

[1] The district court ordered the defendant "committed to the custody of the Commissioner of Public Safety, or his authorized representative, for imprisonment for a period of five (5) years." The court also directed, however, that "the execution of sentence is withheld, and the defendant placed on probation for a period of five (5) years, upon condition that he serve one (1) year in jail."

223

Thirteen separate allegations of error are assigned in this appeal, ranging from assertions that the corpus delicti was not established to charges of prejudicial misconduct by both the trial judge and the Government's attorney. After careful consideration, we have concluded that the only assignment of error which presents a valid and substantial question is the argument that the conviction resulted in part from the admission of certain tangible evidence obtained in violation of the accused's rights under the Fourth Amendment to the United States Constitution.

In the early morning of May 17, 1967, the St. Thomas, Virgin Islands, police were called to the hotel room of a twenty-year-old tourist who stated that she had been raped at knife-point earlier that morning on a nearby beach. She informed the police that her dress and undergarments were in the trunk of the assailant's car. From the victim's description of the assailant and his automobile, the police immediately concluded that Gerard Berne was a prime suspect.

As a result, two uniformed police officers proceeded to the Berne home where they arrived at approximately 7 A.M. According to the testimony of the officers, Berne's mother called her son to the door where the following conversation occurred:

"I asked him if he had a car and where it was parked and he told me it was parked around by the airport and he took me around there."

The police testified that the following conversation ensued at the airport lot, which was approximately 100 yards from the house:

"I told him that I had spoken to the young lady at the Caribbean Beach Hotel and she stated that she was out with a person in this particular make car and she described you down to a T, that's the slang, and I asked him did he have any clothes belonging to this lady and he said 'Yes.' I asked him where it was and he

224

said it was in the trunk of the car and took clothes out of the car and gave me."[2]

With the clothes in hand, the police then proceeded to the station. Berne was not arrested, was not restrained of his freedom in any way, and was permitted to return to his home alone. Later, Berne, in the company of his father, went to the hotel where the victim was staying. While attempting to see her, he was arrested and taken to police headquarters.

Upon arrival at the station, the defendant was advised for the first time of his constitutional rights to counsel and to remain silent, in full compliance with Miranda v. Arizona, 384 U.S. 436 (1966).[3] He then signed a "Warning as to Rights"[4] and voluntarily submitted to further interrogation, during the course of which, he informed the police that there was a hunting knife in his car. At police request, he returned with them to his car and surrendered the knife.

At trial, defense counsel objected to the introduction of the victim's clothes and the accused's knife on the

---

[2] The defendant maintained that the officer physically reached into the trunk and removed the clothing. Accepting this, we do not consider this variance dispositive of the issues involved.

[3] "Before we ask you any questions, we would like to be certain that you know and understand your rights.

"You have a right to remain silent. You have as much right to speak or to answer questions also, but, anything you may say can be used against you in Court.

"You have a right to talk to a lawyer before we ask you any questions. You have a right, too, to have your lawyer with you during questioning. If you want a lawyer, but cannot afford one, a lawyer will be provided for you by a Judge before whom we will take you for that purpose.

"Should you now decide to answer questions without your lawyer present, you will still have the right to stop answering questions at any time you change your mind. You also have the right to stop answering questions at any time until you talk to your lawyer."

[4] "I have read (or have had read to me) the statement telling me of my rights and I now know and understand what my rights are. I am willing to make a statement and to answer questions. I do not want a lawyer. I know and understand what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

grounds that they were the products of an unconstitutional search and seizure. Specifically, it was alleged that the first interrogation and seizure of the victim's clothes were in violation of the Miranda rule and the second seizure of the knife was illegal because the accused had not truly "consented" to the seizure.

■ The substantive right involved here is the individual's right to be protected against unreasonable searches and seizures. Since the word "unreasonable" is by definition a correlative term, dependent for meaning on attendant circumstances, the Supreme Court has consistently recognized that "each case must be judged on its own particular facts." Lewis v. United States, 385 U.S. 206, 212 (1966). Because both seizures here occurred under significantly different conditions, we will treat the appellant's challenge to the legality of the seizures separately.

### FIRST SEARCH

■ Initially, we reject the government's argument that no "search or seizure" within the meaning of the Fourth Amendment occurred when the defendant voluntarily delivered the evidence to the police. The argument misconstrues the fundamental purpose of the Fourth Amendment: to protect the citizen against unreasonable governmental intrusion. That a person may verbalize an approval to a police request to search or seize does not remove the transaction from the purview of the Fourth Amendment. If such were the case, then the application of the Amendment would depend in large measure on the persuasive powers of the police to extract a "voluntary" consent from the suspect.

■ There are certain things which consent obviously is not. Clearly, consent is not merely acquiescence to a claim of lawful authority, Bumper v. North Carolina, 391

U.S. 543 (1968), nor is it dependent upon any affirmative assertion of rights by the subject. United States v. Rembert, 284 Fed. 996 (D.C. Tex. 1922). Consent must never be equated to non-resistance to police orders or suggestions. Judd v. United States, 190 F.2d 649 (D.C. 1951).

The district court concluded that Berne's consent was freely and voluntarily given. Appellant argues, however, that the absence of coercion, suggestion, duress or intimidation is not enough. Rather, he suggests that a new dimension has been added to the concept of consent in the wake of Miranda's holding that:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.

It is appellant's contention that since his oral consent to the search and seizure was given without prior Miranda warnings, the communicative assent cannot be valid.

We recognize that the circumstances presented by this case bring into sharp focus the inter-relationship of the Fourth Amendment's prohibition of unreasonable searches and seizures and the Fifth Amendment's privilege against self-incrimination. As early as 1886, the Supreme Court noted that "the Fourth and Fifth Amendments run almost into each other," and that "compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment." Boyd v. United States, 116 U.S. 616, 633 (1886). In Davis v. United States, 328 U.S. 582, 587 (1946), the Court noted that the "law of searches and seizures . . . is the product of the interplay of these two constitutional provisions."

227

In the years since Boyd, the interpretation of the Fourth and Fifth Amendments has undergone considerable refinement. For example, the respective provisions of both amendments have been held applicable to state prosecutions through the 14th Amendment. Malloy v. Hogan, 378 U.S. 1 (1964); Mapp v. Ohio, 367 U.S. 643 (1961).

■ The refinement in interpretation has also provided a more precise delineation of the scope of each amendment. Generally, it has been held that the Fifth Amendment applies only to "evidence of a testimonial or communicative nature", whereas "the overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion." Schmerber v. California, 384 U.S. 757 (1966). As is so often the case, however, the refinement of concepts ironically tends to produce a complexity which creates as many new similarities as differences. In this fissioning process, decisions such as Miranda can generate a profound chain-reaction among interdependent concepts.

Thus, there is logical and rational support for the appellant's assertion that the safeguards associated with Miranda should also be applied to those situations where the legality of a warrantless search and seizure is justified on the basis of the accused's consent. If the validity of the search is conceived in the communicative assent of the accused, then the vice of self-incrimination is not dissipated because the search produces physical, as opposed to testimonial, evidence. Under such circumstances, the vitality of Fourth Amendment rights are critically dependent on the protective armor of the privilege against self-incrimination.

For the Miranda rule to measure the validity of certain "consent" searches, however, the conditions which pertained in Miranda must be met. An essential requisite for its application is that the accused be "taken into cus-

tody or otherwise deprived of his freedom in any significant way." 384 U.S. at 445. It is only in the context of custody, with its "inherently coercive effect . . . and its consequent deprivation of significant freedom of action," that the Miranda warnings are required.[5] Bearing this in mind, we turn to an examination of the events surrounding the first seizure.

In contrast to the situation in Miranda, where the accused was interrogated for two hours while being held incommunicado in a police interrogation room, the appellant's dialogue with the police occurred at his home, in the presence of his wife and parents. Unlike Miranda, Berne was not "thrust into an unfamiliar atmosphere and run through menacing interrogation procedures". 384 U.S. at 457.

The Court itself went to great lengths in Miranda to contrast the environment of the stationhouse with that of the friendly surroundings of the subject's home. Citing from the observations of an experienced criminal investigator, the Court noted:

"In his home, [the accused] may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law." 384 U.S. at 449–50.

This is not to say that the in-custody requirements of Miranda are only to be found within the confines of the stationhouse. See Orozco v. Texas, 394 U.S. 324 (decided March 25, 1969). But the mere presence of the police at the subject's home cannot be equated, *per se*, with the deprivation of significant freedom of action with which the Court in Miranda dealt. We reject as inaccurate the blan-

---

[5] See United States v. Mackiewicz, 401 F.2d 219 (2 Cir. 1968); United States v. Messina, 388 F.2d 393 (2 Cir. 1968); United States v. Maius, 378 F.2d 716 (6 Cir. 1967).

ket portrayal of legitimate police investigation in gestapo fashion and refute its underlying presumption that the task of law enforcement is antithetical to the full preservation of constitutional freedom.

 In the present case, there was no evidence of the application of force or intimidation, physical or psychological, actual or implied. There was nothing more than a brief inquiry by the police followed immediately by an affirmative response from the subject. This, in turn, was followed by the physical delivery of the evidence to the police. The defendant himself characterized the entire incident as "civil". Considering these factors, we conclude that the appellant was not deprived of his freedom of action in any significant manner and therefore, the application of Miranda was not required.

### SECOND SEARCH AND SEIZURE

What we have said heretofore regarding the principles governing the legality of the first seizure apply with equal force to the subsequent seizure of the accused's hunting knife. But unlike the first, there is not doubt that the defendant was "in custody" at the time of the second seizure, having been arrested and taken to the station.

 The record clearly establishes that upon arrival at police headquarters, the defendant was given a complete Miranda warning. He then signed a written "Consent" in which he declared his willingness "to answer questions". It was during the ensuing interrogation that the accused informed the police of the existence and whereabouts of the hunting knife, and accompanied by the arresting officers, returned to the car to deliver up the knife.[6]

---

[6] Under the rule of Preston v. United States, 376 U.S. 364 (1964), this second search cannot be justified as incident to the defendant's lawful arrest. In Preston, the Court held: "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 376 U.S. at 367.

The appellant contends that his "consent" to this second seizure was invalid because, although warned of his right to remain silent and be afforded the assistance of counsel, he was not apprised of his specific right to refuse to deliver the knife and insist that the police obtain a warrant for its seizure. Relying on the concept of waiver as the "intentional relinquishment or abandonment of a known right or privilege", Johnson v. Zerbst, 304 U.S. 458 (1938), it is argued that the seizure of the knife without prior Fourth Amendment warning was illegal.[7]

The appellant's argument is premised on the assumption that the protection of the Fourth Amendment extended to his automobile, irrespective of his own prolix conduct. As such, it misconstrues the very concept on which the Fourth Amendment is based. The Supreme Court has clearly stated that "the Fourth Amendment protects people, not places". Katz v. United States, 389

---

[7] The same argument was advanced and rejected by the court in Gorman v. United States, 380 F.2d 158 (1 Cir. 1967). Conceding that the proposition had "surface plausibility" in light of Miranda, the court emphasized that the Miranda warnings themselves contain an implicit caution that "things which might be found in a search could be used against an accused." In further distinction, the court pointed out that the underlying rationale of Miranda, namely, concern over the exclusion of coerced and therefore unreliable testimony, is not presented in the area of search and seizure where the reliability of the evidence is not in issue. The court concluded that:

"The objective of this policy would seem to have been achieved when police have given the basic Miranda warnings, when a defendant subsequently voluntarily submits to an orderly interrogation free from any coerciveness other than that implicit in the fact of arrest and custody, when a straightforward request for permission to search is made, and when an unambiguous and positive response is received." 380 F.2d at 164.

Ostensibly opposed to the Gorman ruling is United States v. Nikrasch, 367 F.2d 740 (7 Cir. 1966), where the following language appears: "Since the arrested defendant was then in custody . . . and had not been advised of his Fourth Amendment rights, the trial court correctly observed that no true consent had been given". 367 F.2d at 744. The propriety of this statement, however, has recently been labeled as "dubious" by the same court in Byrd v. Lane, 398 F.2d 750, 755 (7 Cir. 1968).

An intermediate posture was assumed by the Sixth Circuit in Rosenthall v. Henderson, 389 F.2d 514, 516 (6 Cir. 1968), where it was held that "the failure to advise the defendant of his right to withhold consent is only one factor to be considered" in determining the validity of a consensual search.

U.S. 347, 351 (1967). It preserves "the security a man relies upon when he places himself or his property within a constitutionally protected area". Hoffa v. United States, 385 U.S. 293 (1966).

██ There is no doubt that in protecting personal security the scope of the Fourth Amendment extends to all private areas, be they homes, offices or automobiles. These objects and places, however, are not in themselves the proper subjects for constitutional guarantees. It is the personal privacy and security they represent which is within the protective scope of the Fourth Amendment. In his concurring opinion in Katz, supra, Mr. Justice Harlan characterized the rule of the Fourth Amendment in this manner:

" '[T]he Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " 389 U.S. at 361.

Thus, it can readily be seen that in any inquiry into the validity of a consensual search or seizure, the behavior of the accused may be a critical factor. For if by his words or actions the accused indicates he does not expect to be afforded the right to security or privacy which the law might otherwise afford, then there is no rational purpose for invoking a rule to create such a right.

Can it reasonably be said that in the case before us the appellant was relying on the security of his automobile when he voluntarily chose to reveal its contents to the police? Having been warned that anything he said could be used against him, it is inconceivable that his election to disclose the existence and location of the

knife and to deliver it up to the police was anything less than a free and voluntary abandonment of his security in this otherwise constitutionally protected area.

The appellant's position is less tenable than was the defendant's in Hoffa v. United States, supra, where the accused objected to the introduction of his incriminatory statements made in the presence of a secret government informer. The conversations occurred in the defendant's hotel room where the informer had been invited. In rejecting the contention that the use of the informer violated the Fourth Amendment, the Court noted:

"Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." 385 U.S. at 301.

At this point it might be appropriate to ask: If the constitution does not protect one who voluntarily confides in another under the mistaken belief that the other will not reveal it, then why should it extend protection to one who reveals information after being expressly warned that it will legally be employed against him?

This case does not present a situation where the police, lacking evidence to sustain a conviction and confronted with an accused who refuses to submit to interrogation, resort to the device of a consensual search to launch their case. In such instance, the failure to advise the suspect of specific Fourth Amendment rights could raise grave questions. See United States v. Blalock, 255 F.Supp. 268 (E.D. Pa. 1966).

■ But where, as here, the subject voluntarily submits to interrogation and freely offers information on the existence and location of specifically identified evidence, and further agrees to surrender the evidence to the police, fully cognizant of his right to remain silent and fully aware that the information he provides may be used against him,

the seizure of such evidence does not violate the Fourth Amendment. In such a case, the accused, by his words and actions, has abandoned any privacy or security in the location of the evidence. As the Supreme Court emphasized in Katz: "What a person knowingly exposes to the public, is not a subject of Fourth Amendment protection."

The conviction will be affirmed.

---

FREEDMAN, *Circuit Judge*, dissenting

Our acceptance of the jury's determination of the defendant's guilt should not blind us to the grave constitutional question which his conviction presents.

Two uniformed and armed police officers drove up to defendant's home in a police car at 7 o'clock in the morning. They had no warrant for his arrest or for a search of his home or automobile, although they probably had sufficient information to justify the issuance of such warrants. At their knock, his mother opened the door, and he came down to meet them when she told him they were inquiring for him. Defendant testified that he had drunk much liquor that night and was still feeling its effect as well as the lack of sleep, for he had returned home only three or four hours earlier. His adventure of the night would alone have left him most unfit to resist the inquiries of the officers.

On the questioning by the police, defendant admitted that he owned a yellow M.G., apparently unique on the Island, and that it was parked at the airport parking lot, less than 100 yards across the street. He then rode in the police car a short distance to his M.G. Another police officer drove up in a police car and joined them as they arrived. The police asked whether he had anything in his automobile that did not belong to him, and he replied that he did. Asked where it was, he said it was in the trunk of his

car. He was told to get it. Thereupon he opened the trunk and the police obtained from him the victim's dress, girdle and underpants. According to his testimony, he showed the clothing to the police and they took it; the police testified that he handed it to them.

Defendant was given no warning before the questioning at his home and at the time the physical evidence was secured from his car. He testified that he knew nothing about the requirement for a search warrant, and thought that an officer had an inherent right to search his car. When he finally inquired of the officers "What it was all about", they told him that he was being charged with rape, although they did not place him under arrest. A few hours after the police left him, he was arrested and brought to the police headquarters at the Fort, charged with the offense, and then the solemn ritual of a Miranda[1] warning was performed before further questioning took place.

It seems to me that the police were required to comply with Miranda and warn defendant of his right to remain silent and his right to counsel before he answered any of their questions. Such a warning was not given either at his home or at the airport parking lot.

It is said that Miranda is inapplicable because this is not a station house interrogation, and defendant met the officers in the familiar surroundings of his home, in the presence of his wife and parents. The Supreme Court has shown, however, in the very recent case of Orozco v. Texas, 394 U.S. 324, decided March 25, 1969, that the true test in an interrogation subsequent to Miranda is the nature of the circumstances surrounding the suspect, and that coercive environment may be created even in a defendant's home. There four police officers entered defendant's bedroom, where they questioned him and obtained his incriminating answers. That case differs from this

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

because there the officers admitted that defendant was not free to go where he pleased but was under arrest, although it is not clear that they told him this. Mr. Justice Black said:

"The State has argued here that since petitioner was interrogated on his own bed, in familiar surroundings, our Miranda holding should not apply. It is true that the Court did say in Miranda that 'compulsion to speak in the isolated setting of the police station may be greater than in courts or other official investigations where there are often impartial observers to guard against intimidation or trickery.' 384 U.S. 436, 461. . . . According to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The Miranda opinion declared that the warnings were required when the person being interrogated was 'in custody at the station or otherwise deprived of his freedom of action in any way.' 384 U.S. 436, 477."

Here there is no evidence that defendant was under arrest at the time of the initial investigation, but he was in the presence of the police and part of the time was surrounded by them in a police car when they drove the short distance to the airport. At his home the circumstances were such that the officers must have been well aware that by their presence he was under the threat that they might any moment mention in the hearing of his parents and his wife, whom he had married less than a year before, that he was being accused of rape. Even if he were completely innocent of rape he would not have wanted his wife to learn that he had been out all night drinking with a female companion. The police therefore must have known that he would be eager to rid his parents and wife of their presence. Indeed, he would probably have preferred to be alone with the police in a station house than to have them at his home.

I therefore believe that since defendant's admissions under police questioning were the product of circumstances which were coercive, he should not have been required to

answer any questions without a Miranda warning of his Fifth Amendment right to remain silent.

I also believe defendant's Fourth Amendment rights were violated, because his handing over of the incriminating evidence to the police was the result of the same coercive circumstances, without any notice that he was not required to obey their request. Indeed the question whether he had anyone else's clothing in his car was asked when he was in the presence only of the police and had left his home; and if he had refused to answer as the result of a Miranda warning, the entire search incident might never have occurred. In my view the principle of Miranda is as much applicable to defendant's Fourth Amendment rights as it is to the questioning in his home. It therefore was the duty of the police to advise him that since they had no search warrant, he was not required to produce any evidence which he might have in his automobile. If it is improper for the police to question a prospective accused under circumstances inherently coercive without giving him a full warning of his rights and affording him an opportunity to obtain legal advice, it is equally improper for them to demand of him the physical evidence indicating his guilt, without giving him notice that he had the right to refuse their demand when they have no warrant.

I therefore believe that the defendant is entitled to a new trial at which there would be excluded from evidence the garments which the police improperly obtained from him without a warrant following questioning at his home without a Miranda warning.

I therefore respectfully dissent.