**UNITED STATES of America**

v.

**Muzio PELLEGRINI, Defendant.**

**No. 69 Cr. 605.**

United States District Court,
S. D. New York.

Feb. 11, 1970.

Whitney North Seymour, Jr., U. S. Atty., Southern District of New York, New York City, for United States of America; John J. Kelleher, Asst. U. S. Atty., of counsel.

Herbert Zelenko, New York City, for defendant; Louis J. Felstiner, New York City, of counsel.

## OPINION

COOPER, District Judge.

Defendant moves to suppress certain statements and items of real evidence pursuant to Rule 41(e), F.R.Crim.P. on the ground that his rights under the Fourth and Fifth Amendment have been violated.

On October 29, 1969 a hearing was held by us to determine the facts applicable to relief sought. Both sides were content to rest on the testimony of the Government's one witness, Postal Inspector Shatzel. He testified that at about 5:30 A.M. on Saturday, May 17, 1969, while at the Centuck Post Office where defendant worked, he inspected the bin allotted to defendant and found certain mail (bonus coupons) therein which did not belong on defendant's route. From the elevated observation gallery inside the post office, Shatzel observed defend-

ant arrive at about 6:45 A.M. and then, in addition to removing the mail sorted for his own route, remove bonus coupons from the mail clearly sorted for other carrier routes. Shatzel testified that defendant placed these bonus coupons in a sack at the bottom of his mail hamper, then packed his regular mail which he put in other sacks and in turn also placed in his hamper.

Shatzel next saw defendant leave and get into his private car parked in a supermarket lot across the street. He watched defendant park the car in front of the post office, return inside, wheel his mail hamper (containing both the mail for his route and the sack of bonus coupons) to the car, open the trunk and place all of the sacks of mail inside. After returning the mail hamper, defendant drove off.

At about 10:00 A.M. and again at about 11:00 A.M. that same day Shatzel observed defendant delivering mail on his route. At about 2:00 P.M. Shatzel, unable to find defendant on his route, drove past defendant's home and saw defendant's car backed into his driveway.

Shortly after 3:00 P.M. Shatzel, parked in the supermarket parking lot across from the post office, observed defendant park his car in that lot and proceed to the post office. Shatzel was in two-way radio contact with an Inspector Zekas, located in the observation gallery of the post office. At about 3:30 P.M. Shatzel saw defendant leave the post office and walk to his car.

As defendant opened the car door and started to get in, Shatzel, walking toward defendant's car and about ten feet away, hailed defendant by name. Shatzel identified himself to defendant and showed defendant his commission, a wallet-sized identification card. He then told defendant to step out of the car. As defendant complied, Shatzel bent over and looked into the back seat of the car. Seeing nothing Shatzel asked de-

fendant, "Will you open up the trunk of your car?"[1] Defendant did so. As he did, Inspector Zekas arrived from the post office. Shatzel testified that as they were opening up the trunk of the car defendant said to him, "What are you looking for?"; that he replied, "I'm looking for coupons"; and that defendant then responded, "Yes, I know, they're at home."

Shatzel said that he noticed a small boy (whom he assumed to be defendant's son) seated in defendant's car evidently waiting for defendant. Following defendant's admission, Shatzel, standing by the car trunk with defendant and Inspector Zekas, motioned toward the boy and said to defendant, "I don't want to cause you any embarrassment. Will you go home and get these envelopes for me and bring them back to the station." In response, defendant "either said yes or he nodded." Shatzel then told defendant that he would follow him home and back at a "safe" distance of about a city block. Again, defendant either said yes or nodded affirmatively.

Defendant got into his car and proceeded home. Shatzel and Zekas followed in their car, keeping defendant's car in sight at all times. When they reached defendant's house the inspectors parked so that they kept a portion of defendant's car in view. The inspectors then followed defendant back to the post office. Shatzel testified that the purpose of following defendant was "to see that he would come back."

At the post office, defendant got out of his car with the sack of coupons and walked into the station with Shatzel. They proceeded to an office where defendant was duly advised of his constitutional rights. Defendant signed a waiver of those rights and thereafter initialed the retrieved bonus coupons and admitted orally and in writing that he took the coupons to convert them to his own use. After Shatzel discussed de-

---

1. In his testimony Shatzel at first stated that he "told" defendant to open the trunk, but later insisted that what he said was, "will you open up the trunk of your car?" Transcript of Hearing at 14, 17 and 52.

fendant's arrest with the United States Attorney's office, defendant was allowed to go home for the balance of the weekend and told to report on Monday morning for his arraignment.

The issues herein are whether defendant was entitled under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to a warning of his constitutional rights prior to the time he received such warnings at the post office, and, if so, whether defendant is entitled to suppression of the bonus coupons he retrieved and of the statements he made to the officers.

### When the *Miranda* Warnings Are Required

In Miranda v. Arizona, *supra* the Supreme Court held that unless warnings effective to secure the privilege against self-incrimination have been given and such rights knowingly and intelligently waived, no evidence obtained as a result of custodial interrogation (questioning initiated by a law enforcement officer after a person is deprived of his freedom of action in any significant way) may be used by the prosecution.[2] General on-the-scene questioning by officers as part of the fact-finding process is not necessarily custodial interrogation.[3]

Likewise, volunteered statements are not affected by *Miranda*.[4]

In its subsequent decision in Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) the Supreme Court laid to rest any argument that Miranda might be limited to interrogation at the police station, emphasizing that the warnings are required whenever the person being interrogated is "deprived of his freedom of action in any significant way."

■ The Second Circuit has recently defined this test more precisely in United States v. Hall, 421 F.2d 540 (2d Cir. December 15, 1969). That decision rejects the contention that (as in *Escobedo*) *Miranda* warnings are required whenever an investigation has "focused" on a particular suspect. *Miranda's* test of "custodial interrogation" as the point at which warnings are required resulted from concern that the atmosphere of such interrogation would have an inherently coercive effect on the person being questioned. Accordingly, our Circuit reasoned that the test of custody or significant restraint on liberty must be an objective one, and can neither depend upon the officer's inner intentions nor upon the suspect's subjective perceptions. "Some affirmative action by the

---

2. "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

&ast; &ast; &ast; &ast; &ast;

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 479, 86 S.Ct. at 1630.

3. "Our decision is not intended to hamper the traditional function of police officers in investigating crime. [citation omitted] &ast; &ast; &ast; General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." 384 U.S. at 477–478, 86 S.Ct. at 1629–1630.

4. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630.

&ast; &ast; &ast; &ast; &ast;

authorities other than polite interrogation" is required. United States v. Hall, *supra*.

As to the additional affirmative action that is necessary:

"* * * [I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so. This is not to say that the amount of information possessed by the police, and the consequent acuity of their 'focus,' is irrelevant. The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda*, and *vice versa*. But this is simply one circumstance, to be weighed with all the others." *Id*.

### The First Admission

■ Applying these principles to the instant facts, we turn first to defendant's initial admission that the bonus coupons were at his home.

At the outset, we do not believe that the absence of *Miranda* warnings prior to defendant's initial admission can be justified by the simple expedient of terming this "on-the-scene questioning." This was not simply routine inquiry, after the officer's suspicions are aroused, made at the scene as part of the fact-finding process as was the case in United States v. Thomas, 396 F.2d 310 (2d Cir. 1968); United States v. Gibson, 392 F.2d 373 (4th Cir. 1968); Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968); Lowe v. United States, 407 F.2d 1391 (9th Cir. 1969). The officers here had scant doubt, if any, that within their sight a crime had been committed by this defendant. Their primary purpose in approaching defendant was to nail down tangible supportive evidence of this fact.

Nevertheless, defendant may not suppress this admission on the ground it was made before the *Miranda* warnings were given. This admission by defendant was volunteered and did not come as a result of any interrogation; furthermore, even assuming some "polite interrogation," there was no additional affirmative action by the officer at this point which, viewed objectively, would indicate to defendant that he would not be permitted to leave and, thus, there was no "coercive atmosphere." See United States v. Hall, *supra*.

Inspector Shatzel's requests that petitioner get out of his car and open his trunk did not constitute interrogation. It was petitioner who initiated the questioning by asking, "What are you looking for?" The Inspector replied, "I'm looking for coupons," but did not question defendant. Defendant then volunteered the admission, "Yes, I know, they're at home."

While this is certainly closer to interrogation than the immediate spontaneous admission in Amass v. United States, 413 F.2d 272 (2d Cir. 1969), we believe defendant's statement here was volunteered and thus not affected by *Miranda*. See Miranda v. Arizona, *supra*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

■ In any event, we find that the atmosphere surrounding this admission was not coercive from the standpoint of the defendant. The officers were at all times courteous and considerate of defendant. There was no "bearing down" on him. The mere existence of this considerable evidence brought home to Inspector Shatzel, and which clearly established probable cause to believe defendant had embezzled from the United States mails, does not compel a determination that defendant had to be given his *Miranda* warnings at the time of his initial admission. See Lowe v. United States, *supra*, 407 F.2d at 1396; Hoffa v. United States, 385 U.S. 293, 309–310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

While the officers actually did possess overwhelming evidence of defendant's guilt as a result of Inspector Shatzel's investigation and personal observations, defendant was not then aware of the extent of incriminating information already known to them. Defendant was not under arrest. See United States v. Thomas, 396 F.2d at 313. The fact that the officers may have then had an unexpressed intention to detain defendant and restrain his freedom of action is not controlling. See Williams v. United States, 381 F.2d 20, 22 (9th Cir. 1967); United States v. Hall, *supra*; Lowe v. United States, *supra*; Allen v. United States, *supra*, 390 F.2d at 479 n. 3. There was, as of yet, no reason for him to believe himself significantly restrained and not free to depart on request. See United States v. Hall, *supra*.

Accordingly, defendant's motion to suppress his initial admission is denied.

### The Physical Evidence

■ Once defendant volunteered that the bonus coupons were at his home, defendant knew (having supplied the police with this information) that the officers were aware of his crime. It was under these circumstances that the officers, without advising defendant of his constitutional rights, sought and obtained defendant's agreement to return to his home and retrieve the conclusively incriminating mail for them in order to avoid embarrassing defendant in front of his family.

We believe that at this point defendant was in custody and, by any objective standard, well aware that he was not free to depart upon request. Among other pieces of evidence, we are confirmed in this finding by the fact that after defendant acceded to the inspector's request that he go home and bring back the coupons, the inspector informed him that he would follow him home and back, a course which the two inspectors did pursue, in order to be certain that

defendant would return. This was not mere police surveillance of one left to go where he wanted. Compare United States v. Hall, *supra*. This involved actual restraint on defendant's freedom of action.

In Government of Virgin Islands v. Berne, 412 F.2d 1055, 1056–1060 (3rd Cir. 1969), a case which raised problems quite similar to ours in many respects, that Court summarized its relevant facts as follows:

"[T]here was no evidence of the application of force or intimidation, physical or psychological, actual or implied. There was nothing more than a brief inquiry by the police followed immediately by an affirmative response from the subject. This, in turn, was followed by the physical delivery of the evidence to the police. The defendant himself characterized the entire incident as 'civil.'" *Id.* at 1060.

Upon these factors the Third Circuit concluded that the defendant therein was not deprived of his freedom of action in any significant manner and, thus, that the *Miranda* warnings were not then required. *Id.*

The Third Circuit's summary of the facts in *Berne* is equally applicable here. The distinction, however, is that in *Berne* the officers did not arrest that suspect or restrain him in any way even after he supplied them with the physical evidence.[5] With the items in hand the police proceeded to the police station and permitted Berne to return to his home alone. Here defendant was neither free to depart upon request nor unaware of the restraint on his freedom of action; certainly at this point enough had taken place to make him apprehensive that his arrest was imminent.

While defendant's initial admission was volunteered, his agreement to retrieve the bonus coupons came as a result of custodial interrogation, however brief. Defendant was asked to obtain

5. Berne was not arrested until later when he went to the hotel of the victim and attempted to see her. *Id.* at 1057.

the mail matter after substantial restrictions were placed on his freedom of action and without having been advised of his constitutional rights mandated by *Miranda*.

Thus, we are faced with the very difficult issue of whether the absence of *Miranda* warnings renders defendant's consent invalid where he was in custody at the time of his agreement to retrieve the bonus coupons. See Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Colum.L.Rev. 130, 146–148 (1967).

Miranda v. Arizona, *supra* required warnings as to the Fifth and Sixth Amendment rights in order to counteract the pressure toward self-incrimination inherent in the setting of custodial interrogation. In the context of a search consented to by the mother of a suspect the Second Circuit has held that failure to give warnings as to Fourth Amendment rights does not render a search invalid per se and that the courts may still find valid consent absent such warnings. See United States ex rel. Combs v. LaVallee, 417 F.2d 523, 525–526 (2d Cir. 1969). Since in *Combs* there was no custody and the consent was given by the suspect's mother, the Court was not faced with a failure to give the *Miranda* warnings.

In *Combs*, our Circuit cited with approval the First Circuit decision in Gorman v. United States, 380 F.2d 158 (1st Cir. 1967), which did involve failure to warn a suspect. The First Circuit rejected any contention that an accused need be separately warned of his Fourth Amendment rights. They reasoned that there was no need to single out consent searches as requiring a *second* warning system because the risks covered by the initial *Miranda* warnings are not of a

different nature from the self-incrimination which may follow from giving consent to a search.[6] The First Circuit clearly relies upon the fact that the basic *Miranda* warnings had already been given the suspect when, during the interrogation voluntarily submitted to, he consented to the search. See also, Government of Virgin Islands v. Berne, *supra*, 412 F.2d at 1060–1062 and n. 7.

We have no such prior warning here. Our question is not whether separate and additional Fourth Amendment warnings are required; rather, whether where the person is in custody the absence of the *Miranda* warnings is a fatal defect in proving consent. The possibility that a consent to a search by a person in custody may be "invalid in the absence of warnings similar to those required by *Miranda*" was recognized by our Circuit in United States ex rel. Lundergan v. McMann, 417 F.2d 519, 521 (2d Cir. 1969). This issue was not resolved, however, because Lundergan was proceeding by collateral attack and the Court did "not expect that any such ruling would be made applicable to a case where the conviction had already become final." *Id.* at 521.

In Government of Virgin Islands v. Berne, 412 F.2d at 1059, the Third Circuit resolved the issue confronting us as follows:

"Thus, there is logical and rational support for appellant's assertion that the safeguards associated with *Miranda* should also be applied to those situations where the legality of a warrantless search and seizure is justified on the basis of the accused's consent. If the validity of the search is conceived in the communicative assent of the accused, then the vice of self-incrimination is not dissipated because

6. "While the police interrogators must faithfully carry out *Miranda*'s mandate at the threshold, they may then proceed to elicit responses, however incriminating, without further specific warning. To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold.

But that things which might be found in a search could be used against an accused seems implicit in the warning of the right to remain silent which, as the Court observed, is calculated to make him 'more acutely aware * * * that he is not in the presence of persons acting solely in his interest.'" 380 F.2d at 164.

the search produces physical, as opposed to testimonial, evidence. Under such circumstances, the vitality of Fourth Amendment rights are critically dependent on the protective armor of the privilege against self-incrimination." *Id.* at 1059.

We take strength from this reasoning. The practice of having a defendant who has admitted a crime also gather the tangible incriminating evidence, even though probable cause for the issuance of a search warrant is clearly evident, has long been subject to much abuse. Once a suspect is in custody, *Miranda* holds that certain compulsions inherent in that position make it only fair that he should be made "more acutely award * * * that he is not in the presence of persons acting solely in his interest" in order to prevent involuntary self-incrimination.

Whether that incrimination takes the form of a confession or the frequently far more damaging consent to produce the tangible goods in question should not determine the necessity of advising the suspect who is in custody of his rights made imperative by *Miranda*.[7] Implicit in the Fifth and Sixth Amendment warnings given a suspect is the message that an accused need not accede to the request of his interrogators and furnish them with any evidence against himself. See Gorman v. United States, *supra*, 380 F.2d at 164.

Accordingly, the bonus coupons must be suppressed.

### The Confession

■ Immediately after defendant returned from his home to the station with the bonus coupons in hand, the officers gave him the Miranda warnings and he signed a waiver of those rights. He then confessed orally and in writing to taking the coupons. Now we are confronted by the question as to whether defendant's confession was sufficiently insulated by virtue of the Miranda warnings from the taint of the illegally obtained coupons so that we might hold these statements voluntary. Cf. Mapys v. United States, 409 F.2d 964, 966 (10th Cir. 1969); United States v. Gorman, 355 F.2d 151, 157 (2d Cir. 1965).

We believe these confessions must likewise be suppressed as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); Harrison v. United States, 392 U.S. 219 (1968). While we do not find any exploitation of the illegality here, by the same token we cannot say that the confession was obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, *supra*, 371 U.S. at 488, 83 S.Ct. at 417.

From a practical standpoint we believe the initial spontaneous admission that the coupons were at home, which we herein hold admissible, did not reach the impact on defendant that came from his recognition that there was no longer any possible reason to remain silent, a natural reaction which surely resulted from supplying by his own act the clinching evidence of his crime. Compare United States v. Knight, 395 F.2d 971 (2d Cir. 1968); United States v. Gorman, *supra*. Furthermore, there was no appreciable lapse of time (the confession following hard on the heels of the production of the bonus coupons); the causal chain had not "become so attenuated as to dissipate the taint." See Wong Sun v. United States, *supra*, 371 U.S. at 487, 83 S.Ct. at 417. Compare United States v. Gorman, *supra*.

### Conclusion

Accordingly, we grant defendant's motion to suppress (a) certain statements

---

7. In the absence of the required warnings, "*no evidence* obtained as a result of interrogation can be used against [the sus-pect]." Miranda v. Arizona, *supra*, 384 U.S. at 479, 86 S.Ct. at 1630 (emphasis added).

allegedly made by him as hereinabove set out, except as to defendant's initial admission, and (b) certain items of real evidence.

So ordered.