**UNITED STATES of America,**
**Plaintiff,**

v.

**Brian Leo HART, Defendant.**

**Crim. A. No. 2338.**

United States District Court,
D. Delaware.

May 23, 1973.

**836**

Ralph F. Keil, U. S. Atty., and Bruce L. Thall, Asst. U. S. Atty., for plaintiff.

William R. Hitchens, Jr. and Charles M. Oberly, III, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant.

## OPINION

LATCHUM, District Judge.

This case is presently before the Court on the defendant's motion to suppress all evidence obtained from a search and inspection by an agent of the Alcohol, Tobacco, and Firearms Division of the United States Treasury Department of certain firearms acquisition-disposition records maintained by the defendant. The grounds presented for the motion are that no warrant was obtained for the search and that no consent was given for the warrantless search.

The facts are as follows: The defendant Brian Leo Hart ("Hart") operated a federally licensed gun shop in Wilmington. On May 19, 1972 he was convicted in the United States District Court for the Eastern District of Pennsylvania of possessing firearms with obliterated serial numbers, which were altered to fire automatically, a crime punishable by im-

prisonment for a term exceeding one year. He was sentenced to five years probation and fined.

Under 18 U.S.C. § 925(b) a licensed firearms dealer convicted of a crime punishable by imprisonment exceeding one year loses his license at the time of conviction. However, Hart believed that he had a grace period in order to liquidate his firearms business.[1] As a result he placed advertisements in The Swap Shop (a local news sheet) and The Wilmington Evening Journal for a "going out of business" sale.

These advertisements caught the attention of Agent Gerald A. Droze ("Droze") of the Alcohol, Tobacco and Firearms Division of the United States Treasury Department. Droze was aware of Hart's conviction and thought that Hart was now in violation of 18 U.S.C. § 922(h) by his apparent continued dealings in firearms after the date of his conviction. To confirm his suspicions, on July 10, 1972 Droze went to Hart's residence of which the gun shop was a part. Hart was absent at the time, but Droze was admitted by the defendant's wife, Karen Hart. Droze informed her of the possible violation, examined the remaining stock of weapons, and told her he would return later. On July 17, Droze returned, this time with fellow Agent William F. Naylor ("Naylor"). Once again Hart was absent when they arrived. Mrs. Hart admitted them and called her husband, who arrived shortly thereafter. Droze examined Hart's acquisition and disposition records which revealed that Hart had received shipments of firearms after his conviction on May 19, 1972. On the basis of the evidence resulting from this search the Grand Jury returned an indictment on December 13, 1972, charging Hart with nine counts of violating 18 U.S.C. § 922 (h).

Hart now moves to suppress all evidence resulting from Droze's examina-

---

1. Hart claims that following his sentencing on May 19, 1972 Special Agent Ginn of the Treasury Department advised him that he would have 90 days to sell his business out.

tion of his acquisition-disposition records. He argues first that the search was conducted without obtaining the requisite warrant, and second that there was no freely and knowingly given consent to the warrantless search.

The government counters by arguing alternatively (1) that the Treasury agents had statutory authority to inspect the records without a warrant pursuant to 18 U.S.C. § 923(g), (2) that the agents had authority to actually seize the records without a warrant because Hart was actually a custodian of the records for the government by virtue of 26 C.F.R. § 178.127, and (3) that consent was freely and knowingly given to the warrantless search and inspection.

These contentions will be considered in order.

■ First, the government contends that in enacting 18 U.S.C. § 923(g), Congress plainly intended to authorize Treasury agents to enter the premises of firearms dealers during business hours for the purpose of inspecting the dealers' acquisition and disposition records. 18 U.S.C. § 923(g) reads in pertinent part as follows:

"Each . . . licensed dealer, shall maintain such records of . . . receipt, sale or other disposition, of firearms . . . at such place, for such period, and in such form as the Secretary may by regulation prescribe. Such importers, manufacturers, dealers, and collectors shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such

records and the contents thereof as he shall by regulations prescribe. The Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, dealer, or collector for the purpose of inspecting or examining (1) any records or documents required to be kept by such importer, manufacturer, dealer, or collector under the provisions of this chapter . . ., and (2) any firearms or ammunition kept or stored by such importer, manufacturer, dealer, or collector at such premises. . . ."

The government argues that, while the first two sentences quoted above clearly refer only to *licensed* dealers, the third sentence is broader and permits inspection of the records of *any* firearms dealer. The Court is unable to agree with this construction. Such an interpretation ignores the remaining language of the third sentence which limits the firearms dealer inspection "to records or documents *required to be kept by such . . . dealer . . . under the provisions of this chapter. . . .*" (Emphasis supplied). The only records required to be maintained under the chapter are those of *licensed* importers, manufacturers, dealers and collectors. Thus, on its face the statute limits the government's warrantless inspection to those importers, manufacturers, dealers and collectors having a federal license. The legislative history of the statute confirms that only firearm licensees are required to keep records and only such licensees are subject to inspection without warrant.[2]

---

2. "Section 923(d).—Requires *all* licensees to maintain records of 'importation, production, shipment, receipt, and sale or other disposition' of firearms and ammunition as the Secretary may by regulations prescribe and that such records be made available for inspection at reasonable times. The subsection also provides that the Secretary may enter the business premises of a licensee for inspection. . . ." (Emphasis in original). Sen.

Rep.No.1097, 90th Cong., 2d Sess., 2 U.S.Code Cong. & Admin.News, p. 2207 (1968).

"Section 923(f).—Requires all licensees to maintain records of 'importation, production, shipment, receipt, and sale or other disposition' of firearms and ammunition as the Secretary may by regulations prescribe and that such records be made available for inspection at reasonable times. The subsection also provides

The government relies on United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) where the Supreme Court condoned a warrantless search during business hours of a firearms dealer. In that instance the dealer still possessed a federal license, whereas in the instant case Hart's license had expired.[3]

The government cited a number of cases in which a warrantless inspection of records was upheld. However, in each case, the relevant statute made all dealers subject to inspection and required all dealers to keep records. In United States v. Sessions, 283 F.Supp. 746 (N.D.Ga.1968) and in Peeples. v. United States, 341 F.2d 60 (C.A.5, 1965), cert. den. 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965), the parties involved were wholesale liquor dealers. The relevant statutes were 26 U.S.C. § 5114 which required every wholesale dealer of distilled spirits, wine or beer to keep records, and 26 U.S.C. § 5146 which permitted a delegate of the Secretary of the Treasury to inspect the records of any dealer. In Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946), the relevant statute authorized the President to inspect the records of any dealer in materials required for the defense of the United States, and the regulation promulgated by the Office of Price Administration, to which the President had delegated his authority under the statute, required every dealer and intermediate distributor to be accountable for all gasoline, ration credits, gasoline deposit certificates, coupons and other evidence received by him. In Hughes v. Johnson, 305 F.2d 67 (C.A.9, 1962), the relevant statute, 16

U.S.C. § 704, empowered the Secretary of the Interior to promulgate regulations for the preservation of migratory birds. The regulation promulgated thereunder required all commercial establishments receiving migratory game birds to maintain records and to make the records available for inspection by an agent of the Bureau of Sport Fisheries and Wildlife, United States Fish and Wildlife Service. In Shafer v. United States, 229 F.2d 124 (C.A.4, 1956), cert. den. 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956), the statute involved, 7 U.S.C. § 1374, permitted the Secretary of Agriculture to measure the acreage of all wheat farms. The Secretary then delegated the authority to measure acreage to County Committees. In United States v. Del Campo, 345 F.Supp. 1371 (D.Del.1972) and United States v. Crescent-Kelvan Co., 164 F.2d 582 (C.A. 3, 1948), the statute involved, 21 U.S.C. § 374, permitted warrantless inspections of all establishments in which food and drugs were manufactured, processed, packed or held for interstate shipment. Thus, all of the cases cited by the government are inapposite to the instant situation where the statutory authority is limited to warrantless inspections of the records of *licensed* firearms dealers. Therefore, the Court finds no merit to the government's first ground opposing suppression.

■ The government argues alternatively that Hart still possessed a federal firearms license at the time of the search so that his records were subject to a warrantless inspection during business hours. The basis for this argument is that under the regulations of the Internal Revenue Service, 26 C.F.R.

---

that the Secretary may enter the business premises of a licensee for inspection. . . . " H.R.Rep.1577, 90th Cong., 2d Sess., 3 U.S.Code Cong. & Admin.News, p. 4423 (1968).

3. As the Supreme Court stated,
 "We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest and the possibilities of abuse and the threat

to privacy are not of impressive dimensions, the inspection may proceed without a warrant *where specifically authorized by statute.*" 406 U.S. at 317, 92 S.Ct. at 1597 (emphasis added).
Since the specific authorization of the statute is limited to firearms dealers presently holding a license, the records of an unlicensed dealer can only be inspected pursuant to a warrant.

§§ 178.73–178.82, Hart was entitled to a hearing before his dealer's license could be revoked so that his license continued in force even after his conviction until the passage of a reasonable period of time during which a hearing could be requested. This, however, is an incorrect characterization of the facts. The last dealer's license granted to Hart had an expiration date of December 23, 1971. In October of 1971 Hart applied for a renewal of his license. Hart was informed by letter that his application for renewal was being held in abeyance due to his indictment for a firearms violation and that pursuant to 18 U.S.C. § 925(b) the expiration date of his existing license was extended from December 23, 1971 until final disposition of the criminal action pending against him. (GX 1). Thus when Hart was finally convicted on May 19, 1972, the extension of his license terminated. At that moment his existing license expired by its terms and was not revoked. The procedural requirement for a hearing in the event of revocation of an existing license is inapplicable since Hart's license had expired by its terms on May 19, 1972. The Court finds no merit to the government's contention that Hart's license remained in effect after his conviction in the United States District Court for the Eastern District of Pennsylvania on May 19, 1972.

 Secondly, the government argues that no search warrant was required because Hart had a statutory duty to forward his acquisition and disposition records to the Assistant Regional Commissioner of the Internal Revenue Service within 30 days of the discontinuance of his business license on May 19, 1972. The government contends that his failure to do so in effect made Hart a custodian of government property which the government had a right to recover or at least to inspect without first obtaining a search warrant. Accordingly, the government argues that the warrantless inspection made on July 17, 1972 was proper. 26 C.F.R. § 178.127 does provide that the records must be forwarded within 30 days of final discontinuance of a firearms business. In effect Hart became a custodian for the United States after June 18, 1972. However, even granting that the United States was entitled to possession of Hart's firearms records which he maintained while he was licensed, it does not follow that the government could invade Hart's property to search for and seize the records without the procedural safeguard of a warrant. Statutorily-created exceptions to the protections granted by the Fourth Amendment must be clearly circumscribed.

As the Supreme Court observed in Colonnade Corp. v. United States, 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970): "Where Congress has authorized inspection but made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." In that case, the relevant statute, 26 U.S.C. § 7342, made it unlawful for a liquor licensee to refuse admission to a federal inspector. It was argued there, as in the present case, that the statutory scheme implied a Congressional intent to dispense with the normal search warrant requirements in an industry that was traditionally subject to pervasive government regulation. However, in *Colonnade*, the Court made it clear that Congressional intent to dispense with warrant requirements must be explicit and not merely implied.

Other lower federal courts have given narrow construction to other statutorily-created exceptions to the Fourth Amendment. For example, in the area of border searches, customs officials may search an individual on mere suspicion. However, the courts have held that once an individual has left the applicable reasonably defined border area, he is not subject to search by custom officials on mere suspicion. Probable cause is required. See, e. g., Fumagalli v. United States, 429 F.2d 1011 (C.A.9, 1970); United States v. Glaziou, 402 F.2d 8 (C.A.2, 1968), cert. den. 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126

(1969); Marsh v. United States, 344 F. 2d 317 (C.A.5, 1965).

Likewise, even where statutes provide that unstamped narcotics are subject to seizure and forfeiture and that no property rights exist in such property, courts have still required the procedural safeguard of a search warrant to seize the narcotics. See, e. g., Jeffers v. United States, 88 U.S.App.D.C. 58, 187 F.2d 498 (1950), aff'd 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Sanders v. United States, 201 F.2d 158 (C.A.5, 1953).

The Court finds no reason in the present case to depart from the *Colonnade* requirement that statutorily-created exceptions to the Fourth Amendment be explicit. Since explicit authorization is lacking here, the Court holds that Hart's failure to forward his business records by June 18, 1972 does not render him susceptible to a warrantless government search and inspection.

■ Thirdly, the government argues that Hart consented to the inspection of his records so that a search warrant was unnecessary. The burden of proving a free and knowledgeable waiver of Fourth Amendment rights is upon the government. As the Supreme Court observed in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938):

"'[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . we 'do not presume acquiescence in the loss of fundamental rights'." (Footnotes omitted).

Later in Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the Court specifically applied the Johnson v. Zerbst test to Fourth Amendment rights. The Court observed:

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Id. at 548–549, 88 S.Ct. at 1792 (Footnotes omitted).

Lower federal courts often have been faced with factual issues regarding the waiver of Fourth Amendment rights. In Government of the Virgin Islands v. Berne, 412 F.2d 1055, 1058 (C.A.3, 1969), cert. den. 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969), this Circuit observed that consent must never be equated to mere non-resistance to police orders or suggestions. See also United States v. Stanack Sales Co., 387 F.2d 849 (C.A.3, 1968). Later in Harris v. Hendricks, 423 F.2d 1096 (C.A.3, 1970) the Third Circuit laid down a more particularized test:

"It is settled that 'the existence and voluntariness of a consent is a question of fact', to be decided in the light of the attendant circumstances by the trier of the facts. Critical factors of attendant circumstances include the setting in which the consent was obtained, what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search, and his age, intelligence and educational background." Id. at 1099 (Footnotes omitted).

The Court then, in determining whether there was consent to the warrantless search in this case, must consider the factors outlined in Harris v. Hendricks, supra, with the burden on the government to prove that consent was freely and knowingly given.

With respect to the setting on July 17, 1972 in which consent was purportedly obtained, both sides have agreed that the atmosphere was cordial. In this setting Mrs. Hart testified that she did not consider the circumstances adverse and that she had no knowledge that her husband was in danger of being criminally charged with a violation of 18 U.S.C. § 922(h). (Tr. 53).[4] Agent Droze testi-

---

4. Tr. refers to transcript of the suppression hearing.

fied, however, that he had warned Mrs. Hart one week prior that as far as he was concerned Hart was in violation of that provision (Tr. 12–13), and that on July 17 he informed Hart and his wife that they were definitely violating that statute. (Tr. 15). Mrs. Hart testified, on the other hand, that Droze's attitude during each visit had been more of a person trying to help them liquidate their business than of an agent actually investigating a crime. (Tr. 40–44; 47–48; 57–59).

Moreover, since warrantless record inspections had been made by Droze in the past (Tr. 26),[5] Mrs. Hart was under the impression that Droze had lawful authority to inspect the records on July 17. (Tr. 39; 48). Although the government claims that Mrs. Hart knew that she had a right to refuse to let Droze see the records without a warrant because Droze had previously presented her with a warrant the day after Hart's indictment on the original offense, she testified that she did not think a warrant was needed on July 17 because the circumstances were not adverse as they had been on that previous occasion. (Tr. 53). That this was a reasonable belief on her part is confirmed by the fact that Agent Droze himself believed that he had statutory authority to inspect the records and there was no necessity of a search warrant. (Tr. 18). Mrs. Hart stated that she cooperated to the extent that she did because she believed she was required to under the circumstances (Tr. 45–46), and made no objection to the inspection because she thought the agents had the legal right to inspect. (Tr. 48).

From the above disparity of testimony, the Court cannot find that an intelligent, voluntary waiver of Fourth Amendment rights was made.

The Harris v. Hendricks opinion also suggested considering what was said and done by the parties present. Here again there is a disparity in the testimony as to what transpired before Droze inspected the records. Droze testified that he asked Mrs. Hart for permission to examine the records and that no resistance was made. (Tr. 16–17). Mrs. Hart testified that Droze did not ask, but *told* her he was going to look at the records. (Tr. 48–49). Neither Hart nor Agent Naylor could resolve the conflict. Neither remembered how Droze came to look at the records. (Tr. 32–33; 66). Whether Mrs. Hart gave specific consent to the inspection or merely acquiesced remains unresolved.

It appears from the above that the attending circumstances by which Droze examined the books are in dispute. Since the burden rests with the government to prove a free, knowledgeable, voluntary consent to the inspection and since this burden has not been met, the Court concludes that the actions of Mrs. Hart were merely acquiescence and non-resistance which according to *Bumper* and *Berne* do not amount to an intelligent and voluntary consent.

The Court further concludes that Mrs. Hart's acquiescence to the warrantless search was occasioned by her misconception (a view shared by Agent Droze, Tr. 18) that Droze had authority to make a warrantless inspection of Hart's records because the atmosphere surrounding the inspection was such that she was not aware that the inspection was being made for the purpose of obtaining information for an indictment against Hart. While Droze made no

---

5. In fact it appears that Droze had examined the records without a warrant only one week previously. Although Droze denied on direct examination that he had examined the records on July 10th (Tr. 12), the Court concludes that he must have because in the week following July 10th he advised his superiors that additional firearms were being purchased by Hart (Tr. 26). This could only have been determined by an examination of the acquisition-disposition record.

specific announcement of statutory authority, by virtue of his previous course of dealing with the Harts,[6] his authority was implicit. When Droze entered the premises cloaked with that implicit authority, it was tantamount to an announcement that the occupant has no right to resist. This implicit coercion renders nugatory any apparent consent. See Bumper v. North Carolina, 391 U.S. at 550, 88 S.Ct. 1788; cf. Smith v. Rhay, 419 F.2d 160 (C.A.9, 1969).

The government cited several cases in which courts had concluded that consent to a search was voluntarily given.[7] However, in every case cited, the person consenting to the search was aware or made aware beforehand that the search was being made in connection with charging a criminal offense, and in each instance the individual performed some tangible act unambiguously signifying consent, such as stating where evidence was hidden, or physically handing over the evidence to the authorities requesting it. In the instant case the government failed to prove that Mrs. Hart was aware that the search was preparatory to bringing an indictment against her husband, and moreover failed to prove that she gave any consent at all, let alone an intelligent and voluntary consent. The government has failed to sustain its burden of proof that consent was given to the warrantless search.

■ Finally, the government argues that the evidence should not be suppressed as "fruit of the poisonous tree" because the firearm records would inevitably have come to the attention of the United States in response to a subpoena to produce for failure to turn over the records within 30 days of the discontinuance of Hart's business. The Court observes that all nine counts of the indictment returned against Hart refer to firearm acquisitions after May 19, 1972. Since the only records *required* to be turned over by 26 C.F.R. § 178.127 were those required to be kept pursuant to the license, a subpoena of the records to be forwarded within 30 days of final discontinuance of the business would not have produced the records which served as a basis for the indictment, those acquisitions allegedly made after the expiration of Hart's license. Under these circumstances, the "fruit of the poisonous tree" doctrine applies and the evidence must be suppressed.

The above shall constitute the findings of fact and conclusions of law.

An order will be entered in accordance with this opinion.

6. Droze had visited the Hart's shop to inspect the business on six or seven prior occasions. (Tr. 26).

7. United States v. Fields, 458 F.2d 1194 (C.A.3, 1972) (physically handing over flight bag to authorities upon request); United States v. Harris, 453 F.2d 1317 (C.A.8, 1972) (voluntarily supplying handwriting exemplars); Harris v. Hendricks, 423 F.2d 1096 (C.A.3, 1970) (giving apartment key to authorities and advising them to look for more evidence in glove compartment of car); Combs v. La Vallee, 417 F.2d 523 (C.A.2, 1969), cert. den. 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970) (mother inviting authorities to search son's bedroom); Government of the Virgin Islands v. Berne, 412 F.2d 1055 (C.A.3, 1969), cert. den. 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969) (showing evidence in trunk of car and revealing other hiding places during interrogation at station house); United States v. Retolaza, 398 F.2d 235 (C.A. 4, 1968), cert. den. 393 U.S. 1032, 89 S.Ct. 646, 21 L.Ed.2d 576 (1969) (wife in answer to inquiries by authorities going to hiding place and bringing out evidence); United States v. Richardson, 388 F.2d 842 (C.A.6, 1968) (voluntarily placing hands under fluorescent light for examination).