**UNITED STATES of America ex rel. Henry D. HARRIS, Appellant,**

**v.**

**Edward HENDRICKS, Warden, County Prison.**

**No. 18068.**

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1969.

Decided March 13, 1970.

Vincent J. Ziccardi, Philadelphia, Pa., for appellant.

Joseph J. Musto, Asst. Dist. Atty., Philadelphia, Pa., for appellee.

Before BIGGS, KALODNER and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

The relator, Harris, was sentenced by a Pennsylvania court in November, 1967 to serve a ten to twenty month prison term following a jury trial in which he was found guilty on an indictment charging him with larceny, receiving stolen goods, forgery and uttering forged instruments.

The relator's conviction was affirmed by the Superior Court of Pennsylvania, Commonwealth v. Harris, 213 Pa.Super. 714, 244 A.2d 163 (1968), and his petition for allocatur was denied by the Supreme Court of Pennsylvania on October 14, 1968, at No. 297–A, Miscellaneous Docket No. 16. His application for certiorari was denied by the Supreme Court of the United States, *sub nom.* Harris v. Pennsylvania, 394 U.S. 946, 89 S.Ct. 1286, 22 L.Ed.2d 483 (1969), and he then filed a petition for reconsideration of sentence with the state trial judge which was denied April 30, 1969. He commenced serving his prison sentence on May 5, 1969. The next day he filed the instant petition for habeas corpus relief in the District Court for the Eastern District of Pennsylvania. It was denied on June 17, 1969. United States ex rel. Harris v. Hendrick, 300 F.Supp. 554, and this appeal followed. The relator has been at liberty on bail since his petition was filed.

Relator contends that (1) tangible evidence adduced at his state trial was obtained in a "warrantless search" of his apartment and automobile, to which he assented "without knowledge of his rights or privileges", and without his being "apprised of the fact that the police must have probable cause before they could secure a search warrant"; and (2) his "assent was obtained under duress in a coercive setting". The tangible evidence consisted of Sun Oil Company salary checks payable to relator's fellow employees and nineteen payroll check stubs and income tax notification slips, all bearing the names of other employees whose checks had been illegally cashed.

Critical to our disposition are the following facts disclosed by the state trial record and the record of a hearing on relator's pre-trial motion to suppress the challenged evidence:

In March 1957, relator, then 22 years old, was employed by the Sun Oil Company ("Sun"), first as a porter and then as operator of a truck which hauled mail from its Philadelphia office to the United States Post Office in that city. The mail included pay checks and related data for delivery to Sun employees in various parts of the United States.

In October 1962, Sun first learned that pay checks mailed to employees had never been delivered to them but instead were being cashed in the Philadelphia area.

At about 2 P.M. January 14, 1963, relator was summoned by his immediate superiors to Sun's payroll office when

they were advised that earlier that day he had, after identifying himself, unsuccessfully tried to cash the pay check of one Marks, a Sun Indianapolis, Indiana, employee, at a branch office of the Philadelphia National Bank, and that, again earlier that day, a person attired in a Sun uniform had succeeded in cashing the pay check of one Bowers, another Indianapolis employee, at the same banking office.

Relator was then interrogated with respect to the two recited check episodes and other missing checks, by five Sun supervisory employees: Campbell, supervisor of security; Rohr, payroll department manager; Lynch, mail room supervisor; Broadhead, service manager; and Russell, division manager. Shortly after the interrogation started, two Philadelphia police detectives, and two Philadelphia National Bank detectives, joined the group of Sun supervisory employees, at the latter's invitation, and participated in relator's questioning.

During the course of the questioning relator was identified by a bank teller as the person in Sun Oil Company uniform who had cashed the Bowers check in the sum of $258.13.

Also, during the interrogation, relator admitted attempting to cash the Marks check and stated that he had done so as a favor for a fellow employee whose name he did not know.

Relator, throughout his three-hour questioning denied cashing the Bowers check or involvement in any wrongdoing.

Further, throughout the interrogation relator was assured that he was not under arrest. He was told by one of the bank detectives that he could "demonstrate good faith by submitting to polygraphic examination, by allowing us to look at your apartment and look at your automobile." Relator agreed to both the polygraphic test [1] and inspection of his apartment and car. He was not then told of his Fourth Amendment right to be free from a warrantless search, nor was he advised that a search warrant could only be issued on probable cause. Further, he was not advised that evidence found during the search of his apartment and car could be used against him at trial. Nor was he advised of his right to remain silent and that anything he said could be used against him. Relator was not threatened nor was he promised anything when he consented to inspection of his apartment.

When relator and the city and bank detectives arrived at his apartment following the interrogation, he readily supplied them with the door key, invited them to look wherever they desired, and asked them if they would like to have some coffee.

In their search of relator's apartment, the detectives found a brown paper bag which contained the challenged evidence —two Sun payroll checks, seventeen Sun payroll check stubs with the names of Sun employees, nineteen Sun payroll envelopes and twelve income tax information slips. Relator was then placed under arrest. He then volunteered the information that another payroll check could be found in the glove compartment of his automobile which was parked in a garage adjoining the Sun offices. The detectives then proceeded to examine relator's automobile and found the check.

Relator was subsequently indicted on 28 counts charging him with larceny, receiving stolen goods, forgery and uttering forged instruments. He thereafter filed a pretrial motion to suppress the evidence found in his apartment and car on the ground that it was obtained in a search which violated his Fourth Amendment rights.

The motion to suppress was granted on February 20, 1964, following an extended hearing, on the court's finding that "the totality of circumstances" indicated that the relator's consent to the search was obtained through "trickery, coercion and duress." The Superior Court of Pennsylvania reversed the motion judge's disposition on its determination that " * * * the search and

---

1. The polygraphic test was never made.

seizure in Harris' apartment was not unreasonable because it was done with his permission, voluntarily given at a time when he was not under arrest." Commonwealth v. Harris, 203 Pa.Super. 143, 148, 199 A.2d 290, 292–293 (1964).[2]

The trial which culminated in relator's conviction began on April 19, 1966 and continued for four weeks until May 17, 1966. The question of the voluntariness of relator's consent to the search of his apartment and automobile was litigated in great detail during the course of the trial. The issue as to voluntariness was submitted to the jury under instructions not here challenged.

Following rendition of the jury's guilty verdict, motions for a new trial and arrest of judgment were filed, and sentence was deferred pending their disposition. The trial court denied the motions on November 13, 1967 and sentence was then imposed. The judgment of sentence was affirmed on appeal by the Pennsylvania Superior Court as earlier noted.

The District Court, in its Opinion accompanying its Order denying relator's instant petition for habeas corpus relief, concluded with respect to the challenged search that relator's "collective actions cannot reasonably be construed as anything other than the voluntary manifestation of assent." [3]

The District Court further held:

"We cannot perceive the presence of any 'trickery, coercion or duress' on the part of the police. The consent expressed by the relator was manifested in a positive, unequivocal manner; he did not merely acquiesce in the desires of the investigating police." [4]

What has been said brings us to relator's contentions that his consent to the challenged search and seizure "was obtained in a coercive setting", and that in any event it was a nullity because it was given "without knowledge of his rights or privileges" and without his being advised of their existence by his interrogators.

Taking first the contention that relator's consent to the search "was obtained in a coercive setting":

■ It is settled that "the existence and voluntariness of a consent is a question of fact",[5] to be decided in the light of the attendant circumstances by the trier of facts.[6] Critical factors of attendant circumstances include the setting in which the consent was obtained, what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search, and his age, intelligence and educational background.

The records of the state trial and pre-trial motion to suppress the evidence establish that the following stated circumstances attended relator's consent to the search of his apartment and automobile:

On January 14, 1963, relator was summoned by supervising personnel of his employers to Sun's payroll office for questioning when it was learned that earlier that day he had unsuccessfully attempted to cash the pay check of one Marks, employed by Sun in its Indianapolis, Indiana, branch, and that, again, earlier the same day, a person attired in a Sun uniform had succeeded in cashing the pay check of Bowers, another Sun Indianapolis employee. Two Philadelphia detectives and two bank detectives joined the interrogation shortly after it commenced.

Relator during his questioning denied knowledge of, or connection with, the cashing of other employee's checks during several preceding months. He readi-

2. Relator's petition for allocatur was denied by the Supreme Court of Pennsylvania on December 18, 1964, at No. 199–A, Misc. Docket No. 13.

3. 300 F.Supp. 557.

4. 300 F.Supp. 556.

5. Maxwell v. Stephens, 348 F.2d 325, 336 (8 Cir. 1965), cert. den. 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353.

6. United States ex rel. Gockley v. Myers, 378 F.2d 398, 399–400 (3 Cir. 1967).

ly admitted he had attempted to cash the Marks check but said he acted at the request of a fellow employee whose name he did not know. He denied cashing the Bowers check even though he was identified, during his interrogation, by the bank teller as the man who had presented the check for payment and received its proceeds. Relator was never threatened during the course of his interrogation nor was he offered any inducement in connection with his consent to the search of his apartment and automobile. Prior to, and at the time relator consented to the stated search he had not been placed under arrest and he was specifically advised to that effect by his interrogators.

On the score of what was said in connection with his interrogators' request to search his apartment, relator testified as follows at the hearing on his motion to suppress the evidence obtained during that search:

> "Chief [Bank Detective] Kelly came back in from outside the office and he asked me did I have anything of Sun Oil Company in my apartment. And I knew about the stubs but I didn't think to say it was the same thing they were talking about because I don't know anything about it. So I told them no. *So they asked me would I object to going to my apartment, and I told them no again."* [7]

(Emphasis supplied.)

On cross-examination, relator was asked:

> "Q. From the conference, you *voluntarily* went to your apartment, is that correct, after the discussion with Inspector Kelly?
>
> "A. Yes, sir, I did.
>
> "Q. He said you invited them to take a drink with you after they arrived.
>
> "A. No, sir definitely not.
>
> "Q. You didn't offer them anything?

> "A. No, sir. I did offer them coffee, but not the drinks." [8] (emphasis supplied).

Relator did not testify in his direct examination as to what was said by him or the bank and city detectives in connection with his consent to the search of his automobile.

Chief Bank Detective Kelly, however, testified that after relator had been placed under arrest following discovery in his apartment of Sun salary checks payable to his fellow employees, and other data relating to illegally cashed Sun salary checks, that relator had said:

> "Well, since you found those checks I may as well tell you where my car really is. It's in the garage which immediately adjoins the Sun Oil offices at 1608 Walnut Street, and in the glove compartment of that car is another check." [9]

On the score of the factors of relator's age, intelligence and education, the evidence adduced that at the time of his interrogation he was 28 years old; he had graduated high school and thereafter taken courses at several night schools including the Spring Garden Institute of Technology, and that he had graduated the Philadelphia Technology School and been awarded its Certificate in Programming.

The foregoing sustains the District Court's determination, previously recited, that relator, at a time when he was not under arrest, had voluntarily and unequivocally so, consented to the search of his apartment and automobile, without trickery, coercion or duress, as found by the Pennsylvania Superior Court at 203 Pa.Super. 143, 148, 199 A. 2d 290, and by the jury to which the issue of voluntariness was submitted.

We note that the waiver here involved was not the product of an excessive display of police force or authority. See United States v. Marrese, 336 F.2d 501

---

7. Suppression Hearing N.T. pp. 130–131.

8. Suppression Hearing N.T. p. 140.

9. Suppression Hearing N.T. p. 112.

(3 Cir. 1964); Villano v. United States, 310 F.2d 680 (10 Cir. 1962). Harris did not merely acquiesce to police demands. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1969). Nor does he contend that his assent was given only after repeated refusals. See Pekar v. United States, 315 F.2d 319 (5 Cir. 1963).

Coming now to relator's contention that his consent was in any event a nullity because it was given "without knowledge of his rights or privileges" and without his being advised of their existence.

Relator first urges that Miranda v. Arizona [10] and Escobedo v. Illinois [11] imposed a duty upon the police to advise him of his Fourth Amendment rights against a warrantless search, and since they failed to do so his consent to the search was a nullity. Second, he contends that when he gave his consent he was unaware of his Fourth Amendment rights and Johnson v. Zerbst [12] requires that a waiver of a constitutional right must be "an intentional relinquishment or abandonment of a known right or privilege."

On the score of relator's reliance on Miranda it must immediately be noted that it was decided June 13, 1966, after relator was tried and found guilty on May 17, 1966, and it has been squarely held that Miranda applies only to cases where trials have commenced after the date of its decision. Johnson v. New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882, decided June 20, 1966.

Moreover, it has been squarely held that the Miranda doctrine does not require that a suspect be given a specific warning of his Fourth Amendment rights in order to validate a warrantless search. Gorman v. United States, 380 F.2d 158, 164 (1 Cir. 1967).

As to Escobedo its holding has been expressly limited in Johnson v. New Jersey, supra, to incriminating statements elicited by police from a suspect in custody, where he has not been warned of his constitutional right to remain silent, and he has been denied his request to consult with counsel. We have explicitly held that " * * * the rule of Escobedo can only be invoked by a defendant who has requested and been denied counsel." Billingsley v. State of New Jersey, 408 F.2d 1181, 1183 (1969).

As to the Johnson v. Zerbst doctrine of "intentional relinquishment or abandonment of a known right or privilege", appellate courts, prior, and subsequent to Miranda have generally construed it only to require that the waiver be made voluntarily by one capable of understanding its consequence, viz., as here, that a search would be made if consent were given.

This Court recently sustained a post-Miranda conviction in a case where the defendant, before and after he was in police custody, had consented to warrantless searches without being advised of his Fourth Amendment rights, and he contended that he was not aware of such rights at the time his consents were given. Government of Virgin Islands v. Berne, 412 F.2d 1055 (1969), cert. den. 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87, reh. den. 396 U.S. 937, 90 S.Ct. 261, 24 L.Ed.2d 239.

It must be noted parenthetically that Berne considered but did not give effect to the explicit holding in United States v. Blalock, 255 F.Supp. 268 (E.D.Pa. 1966) that a consent to a warrantless search is a nullity when warning is not given of a Fourth Amendment right to refuse such a search and there is no evidence that the consenting party was aware of such right.[13]

---

10. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

11. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977 (1964).

12. 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

13. *Blalock* was not followed by a later case in the Eastern District of Pennsylvania, United States ex rel. Anderson v. Rundle, 274 F.Supp. 364 (1967), aff'd on other grounds, 393 F.2d 635 (3 Cir. 1968).

For the reasons stated we do not subscribe to relator's contention that his consent to the search of his apartment was rendered a nullity because he was not aware of his Fourth Amendment rights and he had not been advised as to these rights at the time his consent was given.

For the reasons stated in our discussion of the points presented on this appeal, the Order of the District Court denying the relator's petition for a writ of habeas corpus will be affirmed.