UNITED STATES of America

v.

Henry A. MOLT, Jr.

Crim. No. 77–338.

United States District Court,
E. D. Pennsylvania.

Jan. 19, 1978.

Thomas E. Mellon, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward F. Kane, Norristown, Pa., for defendant.

## OPINION

DITTER, District Judge.

Defendant, Henry A. Molt, Jr., is charged with participating in a conspiracy to violate customs and wildlife laws in violation of 18 U.S.C. § 371.[1] He has now moved to suppress all the evidence obtained from him by United States customs agents on January 14, 1975, by a search and seizure without a warrant as well as all items seized on January 22, 1975, pursuant to a search warrant which Molt contends was the unlawful fruit of a poisoned tree.[2] I agree with him and accordingly will suppress all the evidence secured on those two occasions.

1. Specifically, the indictment alleges that defendant conspired to wilfully and unlawfully sell and offer for sale in interstate and foreign commerce 25 radiated tortoises, a species of wildlife listed on the endangered species list of December, 1970.

2. Molt has also moved to dismiss the indictment. See Part 7, infra.

## 1. *The Factual History.*

As a result of information received from the New York Customs office and prior visits,[3] Michael O'Kane and John Friedrich, United States Customs Agents, went to defendant's place of business, the Philadelphia Reptile Exchange (Exchange), Willow Grove, Pennsylvania, on January 14, 1975, for the purpose of examining his importation records. They were accompanied by John P. McGowan, a detective of the local police department. Molt purchases and sells reptiles to zoos, hobbyists, and collectors. In carrying out his business activities, Molt deals not only with reptiles native to the United States but also those from other countries. After initially denying the records were at the Exchange,[4] Molt asked Agent O'Kane by what authority could United States customs inspect importation records. O'Kane showed him photostatic copies of 19 U.S.C. §§ 1509, 1510, and 1511 which Molt read. Molt then said he had no objection to O'Kane's looking at his records but that he found it hard to believe that they could search without a warrant and that he wished to talk to his attorney. While waiting for the attorney to return his call, Molt asked what would happen if he did not consent to having his records examined. Agent O'Kane testified that he responded as follows:

"Let me make it clear to you. Number one, you are not under arrest. Number two, you are not being detained. You are not under any rule or order to show us your records and you could tell us to get out of your store and we'll have to go." And I said, "But if I do leave," I said, "It will be for the purpose of getting into my car, going down to the city, obtaining a *warrant,* come (sic) back and examine your Customs importation records." (N.T. 1–29). (Emphasis added)

Thereafter, the lawyer telephoned Molt and spoke to O'Kane who cited to him Sections 1509, 1510 and 1511 of Title 19. O'Kane told the attorney that so far as he knew there was nothing wrong with regard to Molt, and at this point, in fact, O'Kane had no knowledge that Molt had committed any offense. The agent also related that Molt was not under arrest and that if requested to leave, he would do so but that he would get a warrant so that Molt's records could be examined. He stated, "I can leave somebody here to keep this place under surveillance, go back and get the paperwork and come here and do what I have to do" (N.T. 1–160), but that an examination of the records on the premises was authorized without such paperwork. Molt once again spoke with his counsel, and restated that he had nothing to hide. As a result of these conversations, the lawyer advised Molt that he might as well let the agents examine the records. Molt then said that since O'Kane had the right to see his papers he would open his files and did so. O'Kane then examined records in Molt's "foreign" file drawer for well over an hour,[5] discovering numerous instances of false invoicing,

---

**3.** This information related that a business owned and operated by Mr. Molt had been importing wildlife, had also been offering for sale reptiles indigenous to Australia, and that possible violations of customs laws had been committed.

On January 7, 1975, Agents O'Kane and Friedrich attempted to see defendant's importation records but were unable to so inspect. Mr. Molt was not present on their first visit and when they returned the same day, Molt advised them that the records were not available. An appointment was scheduled for January 13, 1975, at 10:00 A.M. for Mr. Molt to appear at the United States Customs House and to bring his records. Defendant disputes that this was an appointment, but in any case, he failed to appear at that time.

**4.** Between January 7, 1975, and January 14, 1975, Agents O'Kane and Friedrich attempted to learn something about wildlife and related laws, since they had never been involved before with a wildlife matter. They contacted Robert A. Udell, whose name had been mentioned in the information received from New York. Udell stated that he had been an employee of Molt and that Molt kept very good records in a file cabinet in the store (N.T. 1–11–1–17).

**5.** Molt asserts that Agent O'Kane did not confine his examination to the "foreign" file drawer but that documents in the "zoos" and "domestic" drawers were inspected also. I find Agent O'Kane's testimony more credible, however, and conclude that these other drawers were not examined on that day.

which he interpreted to show violations of the customs laws. These same documents were then compared with entries in Molt's check ledger for at least another half hour. O'Kane also looked at records in Molt's "to be filed" box and others on his desk. Having found what he considered to be evidence of numerous violations, O'Kane told Molt that he would have to take the files with him. Molt protested and asked to call his lawyer once more. O'Kane spoke with the attorney again, assuring him that he had the power to take Molt's records and commenting that he would be remiss if he failed to do so. Thereafter, O'Kane seized the contents of Molt's "foreign" file drawer, taking not only those "numerous" files which showed "obvious" violations but also all of the files (71 in all) in this drawer, together with a notebook from the drawer and certain papers from the "to be filed" box. Molt then asked for permission to remove personal papers from the files, but this request was refused on the basis that Molt had previously stated that the files contained nothing personal in nature. Molt refused to sign a receipt prepared by O'Kane and told Detective McGowan, "I want it known for the record that these records are being taken from my establishment against my wishes" (N.T. 3–81). Molt and his attorney were invited to go to the Customs House when the seal to the box would be broken the next day, at which time Molt could look through the files for any personal correspondence, but neither did so.

As a result of an examination made of these files and additional information gained from speaking with other witnesses, O'Kane went before United States Magistrate Richard A. Powers, III, on January 21, 1975, and obtained a search warrant for Molt's business premises.[6] This search was carried out on the following day, January 22, 1975, at which time and pursuant to the warrant, additional files, notebooks, mailing lists, and tapes were seized. In addition, a Nile Crocodile was taken and three other reptiles were constructively seized.[7]

After a three-day suppression hearing, I asked defense counsel and the assistant United States attorney to file briefs addressing these issues: 1) do Sections 1509, 1510, and 1511 give customs agents the authority to inspect documents on an importer's premises and if not, what are the consequences if the agents do so nonetheless; 2) did Molt consent to the initial search; 3) would the agents' good faith make any difference; and 4) what was the agent's authority to remove any or all of the documents? I shall address each of these issues separately.

2. *Sections 1509, 1510 and 1511 of Title 19 do not authorize customs agents to examine importation documents on the importer's premises.*

It is obvious from reading 19 U.S.C. §§ 1509, 1510 and 1511 that Agents O'Kane and Friedrich went far beyond their statutory authority when they told Molt and his attorney that they had the *right* to inspect importation records at the Exchange. The three sections narrowly prescribe what agents may do when an importer refuses to allow the inspection of his documents.

Section 1509 [8] provides that an importer may be cited to appear before customs offi-

---

6. A number of documents obtained through the January 14, 1975, seizure were used as support for Agent O'Kane's affidavit for search warrant.

7. A red seizure sticker was placed on the cages housing these reptiles, although Molt was permitted to retain custody of them.

8. 19 U.S.C. § 1509, which provides in pertinent part:

Appropriate customs officers may cite to appear before them . . . and to examine upon oath, . . . any owner, import-

er, consignee, agent, or other person upon any matter or thing which they . . . may deem material respecting any imported merchandise then under consideration or previously imported within one year, in ascertaining the classification or the value thereof or the rate of amount or duty; and they . . . may require the production of any letters, accounts, contracts, invoices, or other documents relating to said merchandise, and may require such testimony to be reduced to writing, . . .

cers, give testimony, and produce documents in connection with the classification, value, or amount or rate of duty of merchandise imported within one year. Should the importer neglect or refuse to attend, testify, or produce records, he may be fined not less than $20. nor more than $500. as provided by Section 1510.[9] If he fails to allow an appropriate customs officer to inspect his records, Section 1511 [10] provides that customs shall then prohibit him from importing any merchandise and shall withhold delivery of any merchandise already imported.

Clearly, the only section on which the government can rely at all is 1511 since Molt was not cited to appear before customs officers to give testimony or produce documents. The government asserts that Section 1511 is part of the general administrative scheme which has provided customs officers with great discretion in the collection of revenue [11] and the enforcement of strict and severe statutes governing the seizure, forfeiture, and mitigation of penalties arising out of customs laws violations.[12] Because of this broad administrative au-

thority, the government argues, Section 1511 looks to the voluntary, consensual disclosure of information by an importer.

█ While Section 1511 may look to voluntary disclosure and compliance, it is part of a statute which gives agents certain limited enforcement powers. Although customs agents can ask to see records, if they represent that they have the unqualified right to make an inspection, they are wrong. It is evident Congress intended that when an importer refuses to allow an inspection upon an oral request, the investigating officer must first obtain a written request before he can demand anything.[13] Should the importer thereafter fail to permit the inspection, the remedy is to prohibit any further importation and withhold delivery of already-imported merchandise. Section 1511 does not give agents the power to follow any other course. Therefore, I hold that the agents acted beyond their authority in telling defendant and his attorney that they had the right to inspect Molt's importation records on his premises.

**9.** If any person so cited to appear shall neglect or refuse to attend, or shall decline to answer, or shall refuse to answer in writing any interrogatories, . . . or to produce such papers when so required by . . . an appropriate customs officer, he shall be liable to a penalty of not less than $20. nor more than $500. . . 19 U.S.C. § 1510.

**10.** If any person importing merchandise into the United States or dealing in imported merchandise fails, at the request of the Secretary of the Treasury, or an appropriate customs officer, or the United States Customs Court, or a judge of such court, as the case may be, to permit a duly accredited officer of the United States to inspect his books, papers, records, accounts, documents, or correspondence, pertaining to the value or classification of such merchandise, then while such failure continues the Secretary of the Treasury, under regulations prescribed by him, (1) shall prohibit the importation of merchandise into the United States by or for the account of such person, and (2) shall instruct customs officers to withhold delivery of merchandise imported by or for the account of such person. If such failure continues for a period of one year from the date of such instructions the appropriate customs officer shall cause the merchandise, unless previously exported, to be sold at public

auction as in the case of forfeited merchandise. 19 U.S.C. § 1511.

**11.** See, e. g., 19 U.S.C. § 1500, which authorizes an appropriate customs official to appraise merchandise, ascertain its classification and the rate of duty applicable, fix the amount of duty to be paid, and liquidate the merchandise, if necessary.

**12.** See, e. g., 19 U.S.C. § 1592, which provides for forfeiture of imported merchandise, and 19 U.S.C. § 1618, which permits the remission or mitigation of penalties.

**13.** Before demanding an inspection of any importer's books, correspondence, or records pursuant to section 511, Tariff Act of 1930, as amended (19 U.S.C. § 1511), which authorizes such inspections and the prohibition of importations of merchandise or the withholding of delivery of merchandise for an importer failing to permit a duly accredited officer to inspect books, correspondence, or other records, the investigating officer shall present a written request for such inspection signed by the Commissioner of Customs, Regional Commissioner of Customs, district director of Customs, or judge of the U.S. Customs Court. 19 C.F.R. § 162.1.

### 3. *Molt did not consent to the examination of January 14, 1975.*

It is well-settled that one exception to the requirement of both probable cause and a warrant is a search that is conducted pursuant to consent. When a prosecutor relies upon consent to justify the lawfulness of a search, he has the burden of proving it was "freely and voluntarily given," *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), and if the search is coerced by threats or force, or granted only in acquiescence to an improper claim of lawful authority, the consent will be declared invalid. *Id.* at 548–49, 88 S.Ct. at 1792. ". . . [I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973). While knowledge of the right to refuse consent is one factor to be considered, "the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* at 227, 93 S.Ct. at 2048.

■ Here, all conversations were at Molt's place of business, so that "the specter on incommunicado police interrogation in some remote station house is simply inapposite" and there is no reason to find that Molt was "presumptively coerced." *Schneckloth v. Bustamonte*, supra, 412 U.S. at 247, 93 S.Ct. at 2058. The conversations were admitted by all to be "low-key" and congenial, at least until Molt objected to the seizure of the documents. Although Detective McGowan accompanied the agents to the Exchange, there was by no means an excessive display of police force or authority. In addition, Molt is college educated and an experienced businessman who frequently traveled overseas to develop his business interests. Despite these factors, however, I conclude that Agent O'Kane's misrepresentation of his power to examine the records so pervaded the atmosphere at the Exchange as to make Molt believe he had no choice but to submit to the agents' search.[14]

It is true that Molt did state on a number of occasions that he had nothing to hide and that he would permit an inspection but he also questioned the agents' right to examine on a similar number of occasions. He refused to allow the inspection until he had spoken to his attorney to whom O'Kane also misrepresented what he could do. It was only after this conversation that Molt allowed access to the filing cabinet. Despite the fact that Molt was permitted to read three sections from Title 19, this hardly made him a lawyer or apprised him of the narrow scope of O'Kane's power. In short, Molt was told he had to submit to an inspection and he accepted what he was told. This was not knowing and voluntary consent, but surrender to a totally inappropriate assertion of authority.

Much was made at the suppression hearing about the difference between a citation and a search warrant. Agent O'Kane testified that when he told Molt and Molt's lawyer that he could get a warrant to inspect Molt's records he was referring to a citation to appear and produce documents.[15] At that time, O'Kane knew he had no probable cause as is evident from the fragmentary facts then in his possession and from what he told Molt's attorney. Nevertheless, O'Kane used the word "warrant," as he himself said, and when he described to Molt what he intended to do, it was what a warrant would permit. There was no description of the citation procedure.

In summary, I find that O'Kane did not have the authority to search but said that he did. However innocent this misrepresentation may have been, it was the key that unlocked Molt's files. Molt's consent was therefore invalid.

---

**14.** The critical factors that must be assessed in determining whether one consented

. . . include the setting in which the consent was obtained, what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search, and his age, intelligence and educational background. *United States ex rel. Harris v. Hendricks*, 423 F.2d 1096, 1099 (3d Cir. 1970).

**15.** See 19 C.F.R. § 162.1.

*4. The warrantless seizure of Molt's documents was invalid.*

Whatever might be said about Molt's consenting to a search of his papers, no one contends that Molt consented to the warrantless *removal* of his records from the Exchange. All the evidence, including the testimony of Detective McGowan, is precisely to the contrary.

Is there any other basis on which that seizure can be justified?

The government contends that the documents were evidence of a crime and, as such, might be seized on Molt's premises because they were in plain view. This argument cannot avail.

■ It is well established that in certain circumstances law enforcement officers may seize without a warrant evidence which is in their plain view. The limits on the doctrine are essentially twofold. First, there must be some prior justification for the officers presence, whether it be a warrant for another object, hot pursuit, a search incident to a lawful arrest, or some other legitimate reason unconnected with a search for the object in question. The second limitation is that the discovery of evidence in plain view must be inadvertent. The plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating develops. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).

As I have previously stated, Molt's consent to an examination of his records was invalidly procured. Thus, there was no justification for the intrusion upon his files. But even if I were to conclude that his consent was validly obtained, the discovery of the evidence was not inadvertent. It was the result of a deliberate, systematic, exploratory search—a general rummaging.

The plain view doctrine did not justify a warrantless seizure.

Even if it be assumed for the sake of argument that agents could seize *incriminating* documents without a warrant, the fact remains that they admittedly took far more than those which O'Kane thought showed obvious violations. The agents took the entire "foreign" drawer, 71 files in all. There was a notebook in the drawer. It showed no illegality—only that Molt had imported specimens. The agents took it anyway. They took papers from Molt's "to be filed" box, some, but not all of which, Agent O'Kane felt showed violations. The same was true of other papers on Molt's desk.

The conclusion that the agents acted unlawfully is buttressed by customs regulations which state what an agent may do.

First of all, a customs officer may obtain a search warrant. Had the right to search existed, Agent O'Kane's discovery of incriminating documents may well have provided the necessary probable cause. However, "[C]ustoms officers to whom a warrant is issued to search for and seize merchandise are without authority to remove letters and other documents and records, unless they themselves are instruments of crime and are seized as an incident to a lawful arrest." 19 C.F.R. § 162.14.

■ Thus, the only documents which may be lawfully seized are those which are instrumentalities of a crime, not merely incriminatory. On the other hand, a customs officer who is lawfully on an importer's premises and "is able to identify merchandise which has been imported contrary to law may seize such *merchandise* without a warrant" (emphasis added). 10 C.F.R. § 162.11.[16]

Obviously, had Congress and the Secretary of the Treasury intended that an agent be authorized to seize records without a

---

**16.** See also 19 C.F.R. § 162.21(a):

*Seizures by Customs Officers*: Any Customs officer having reasonable cause to believe that any law, the enforcement of which is within the jurisdiction of the Customs Service, has been violated by reason of which any property has become subject to forfeiture, shall seize such property if available. A receipt for seized property shall be given at the time of seizure to the person from whom the property is seized.

warrant, the same authority that permits the seizure of merchandise could have been given. Instead, the authority to seize records only exists as to those which are themselves instruments of crime and then only as an incident to a lawful arrest.

The more searching the analysis, the more the law is examined in the light of the facts, the more ludicrous any pretended legality becomes. Obviously there was no consent to or justification for any seizure, much less to the total seizure which occurred.

5. *Despite the agents' good faith, the evidence must be suppressed.*

I found as a fact in this case that Agents O'Kane and Friedrich acted in good faith—that is, they did not deliberately misstate their authority to Molt. Unfortunately, this does not right the wrong which follows from their unlawful conduct.

The Fourth Amendment "was intended to protect the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886), from searches under unchecked general authority" (footnote omitted). *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976). The exclusionary rule is a judicially created means of effecting those rights. In *Stone*, supra, Justice Powell, writing for the majority, stated that the purpose of applying the rule is to deter law enforcement officials from violating the Fourth Amendment and, in the long run, to encourage them to incorporate Fourth Amendment ideals into their value systems. But he also recognized that application of the rule deflects from the truth-finding process and often affords a

guilty defendant an undeserved windfall, particularly where the error committed by the police official is minimal. Justice White, urging a modification of the rule, added that when law enforcement personnel have acted in good faith and on reasonable grounds, the exclusion of evidence can have no deterrent effect and the only consequence is to keep unimpeachable and probative evidence from the fact-finder.

█ It may be that *Stone* presages a modification in the harsh effect of automatic exclusion in the face of a Fourth Amendment violation. If that be so, this is not the minimal error, reasonable grounds case to introduce such a change. Here the agents' conduct was not incidental or accidental, but was planned and prolonged. Even under any balancing test,[17] the conduct was of such magnitude and significance that highly relevant evidence must be withheld from the trier of fact. I must suppress because the importance of deterring future unlawful activity of this type transcends the regrettable effect that exclusion may have on the possibility of successfully prosecuting Molt.

6. *The evidence seized pursuant to the search warrant is fruit of a poisoned tree and must be suppressed.*

█ It is clear from a reading of Agent O'Kane's affidavit of probable cause for the January 21, 1975, search warrant that heavy reliance was placed on the records unlawfully seized at the Exchange the week before. Aside from some sketchy information received from the New York Customs office, a reference to two fines Molt had paid,[18] and a statement that Molt

17. In *Stone*, the Court concluded that where a state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not receive habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In so doing, the majority reasoned that any contribution of the exclusionary rule in a habeas corpus proceeding is minimal when *compared* to the "costs to other values vital to a rational system of criminal justice." *Stone v. Powell*, 428 U.S. 465, 493–94, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976).

Although the Court spoke of a balancing test and the idea of proportionality generally, id. at 490, 96 S.Ct. at 3050, it is clear that these concepts were specifically made applicable only to the situation then at issue—where habeas corpus relief was sought—and not to all criminal proceedings.

18. On April 23, 1974, Molt pled guilty to a charge of incorrectly labeling cartons containing live reptiles, and he paid a fine of $500. Previously, defendant incurred a $100. civil penalty fine to the United States Fish and Wild-

possessed a reptile on the endangered species list, Agent O'Kane's allegations were premised on 16 exhibits to his affidavit. These exhibits were all documents which Agent O'Kane had carried away from the Exchange. It follows that the evidence obtained pursuant to the warrant was secured by exploitation of the initial illegality, is fruit of a poisoned tree, and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 99 L.Ed.2d 441 (1963).

In addition, this is not a case where "the connection between the lawless conduct of the . . . [agents] and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' " *Id.* at 481, 83 S.Ct. at 417, quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Agents O'Kane and Friedrich continued their investigation until January 21, 1975, when they secured the warrant, but none of the information gained in this interim was used as support for probable cause. Thus, the evidence seized on January 22, 1975, was not secured "by means sufficiently distinguishable to be purged of the primary taint" (citation omitted). *Id.* at 488, 83 S.Ct. at 417.

7. *The motion to dismiss the indictment must be denied.*

■ Defendant has moved to dismiss the indictment on the ground that the pre-indictment delay in this case has caused substantial prejudice to his right to a fair trial.[19] There was a long delay—over 30 months[20]—but the mere passage of time is insufficient to cause dismissal. Not only must defendant demonstrate that he suffered actual prejudice, he must also show that the government used the delay solely

to gain tactical advantage over him. *United States v. Lovasco*, 431 U.S. 783, 788–796, 97 S.Ct. 2044, 2048–2052, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 324–25, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971). Defendant has failed to carry this burden. Here the prosecutor waited until he was completely satisfied that he should prosecute and would be able to establish guilt beyond a reasonable doubt. Therefore, there is no basis to dismiss the indictment.

8. *Conclusion.*

I find the evidence discovered in the warrantless search must be suppressed. Molt did not consent to the search, but merely acquiesced to a claim of legal authority that was completely misrepresented. Even if he did consent, the agents acted beyond their authority in seizing Molt's documents. The seizure was not justified under any exception to the requirement of a warrant. Moreover, the agents' good faith conduct will not preclude application of the exclusionary rule. As a result of the illegal seizure without a warrant, the subsequent seizure pursuant to a warrant was fruit of a poisoned tree and must be suppressed. However, there has been no showing that the delay between the government's learning of Molt's alleged illegal activities and the return of the indictment provides any basis for dismissal.

---

life Service because he unlawfully imported various reptiles from Australia into a non-designated port of entry. See Paragraph 3 of Agent O'Kane's affidavit.

19. Molt was indicted on August 4, 1977.

20. Molt has also moved to dismiss the indictment on the basis that the Lacy Act, 18 U.S.C.

§ 43, which proscribes the transportation of wildlife taken in violation of state, national, or foreign laws is unconstitutional. My learned colleague, the Honorable Herbert A. Fogel, will address this issue shortly in another case involving Molt. If Judge Fogel decides the act is unconstitutional, Molt may renew his motion to dismiss here.